**EXHIBIT G**

## PATENT PURCHASE AGREEMENT

This PATENT PURCHASE AGREEMENT (this *"Agreement"*) is entered into, as of the Effective Date (defined below), by and between LG Electronics Inc., a Korean corporation with a business address of LG Twin Towers 20, Yoido-dong, Youngdungpo-gu, Seoul, South Korea, 150-721("*Seller*") and TQ Lambda LLC, a Delaware Limited Liability Company, with a business address of 805 Las Cimas Parkway, Suite 240, Austin TX 78746 ("*Purchaser*").    The parties hereby agree as follows:

**1.    BACKGROUND**

1.1       Seller owns certain provisional patent applications, patent applications, patents, and/or related foreign patents and applications.

1.2       Seller wishes to sell to Purchaser all right, title, and interest in such patents and applications and the causes of action to sue for infringement thereof and other enforcement rights.

1.3       Purchaser wishes to purchase from Seller all right, title, and interest in the Assigned Patent Rights, free and clear of any restrictions, liens, claims, and encumbrances except as set forth in *Exhibit B*.

**2.    DEFINITIONS.**

*"Assignment Agreements"* means the agreements assigning ownership of the Patents from the inventors and/or prior owners to Seller.

*"Assigned Patent Rights"* means the assets, tangible and intangible, and the rights described in Sections 4.1 and 4.2.

*"Closing"* has the meaning set forth in paragraph 3.1.

"*Confidential Information*" means any information disclosed by or on behalf of the Discloser to the Recipient during the term of this Agreement, including the terms of this Agreement, except information that Recipient can demonstrate: (a) is or becomes generally available to the public other than as a result of disclosure by the Recipient; (b) is independently developed by the Recipient without use of or reference to the Confidential Information; or (c) is obtained by the Recipient from a third party that has not breached any obligations of confidentiality.

*"Deliverables"* means to the extent such information or documents exist and are under Seller's possession or control: (a) a copy of the recordable *Assignment of Patent Rights* in the form attached hereto as *Exhibit A*, duly executed by Seller; (b)original ribbon copy or certificate of invention for each issued Patent issued by the United States Patent and Trademark Office or other jurisdictional patent office in the possession of Seller; (c) file wrappers for each of the Patents, as applicable (such file wrappers to include the documents in the possession of Seller, as applicable, relating to the invention disclosure, inventor registrations, and official communications with patent offices, including receipts and letter of patents);   (d) to the extent such information can reasonably be obtained by Seller, all inventor notebooks and other documents constituting or related to the conception or reduction to practice of the inventions claimed in the Patents; (e) to the extent such information is not protected by the attorney-client privilege and can reasonably be obtained by Seller, all files and documents constituting or related to the evaluation, preparation, prosecution, defense, and enforcement of the Patents; and (f) to the extent such information can reasonably be obtained by Seller, such additional documents as Purchaser may

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EVOLVED-0213180

EW_ITC-0628686

reasonably request in order to ascertain the accuracy of Seller's representations and warranties in this Agreement, or to effect, perfect and evidence the transactions contemplated by this Agreement.

"*Discloser*" means the party disclosing Confidential Information hereunder.

"*Docket*" means Seller's or its agents' list or other means of tracking information relating to the prosecution or maintenance of the Patents throughout the world, including, without limitation, the names, addresses, email addresses, and phone numbers of prosecution counsel and agents, and information relating to deadlines, payments, and filings, which list or other means of tracking information is current as of the Effective Date.

"*Effective Date*" means January 24, 2014.

"*Encumbrances*" means license, covenant, non-assertion, immunity, release, right of first refusal, options, lien, claim, mortgage, security interest or other encumbrances and restrictions

"*Executed Assignments*" means both the executed and notarized Assignment of Patent Rights in *Exhibit A,* as signed by a duly authorized representative of Seller, and the additional documents Seller may be required to execute and deliver under Article 5.

"*Knowledge*" means that the Seller has made enquiries of and disclosed all documents and information within the awareness, possession and control of Seller

"*Mobile Communication Products*" means a portable telephone device intended to be used to make and receive wireless voice and data communications.

"*Mobile Communication Business*" means a division of Seller which includes making or selling Mobile Communication Products under Seller's internal organization.

"*Payment*" has the meaning set forth in paragraph 3.4.

"*Recipient*" means the Party receiving Confidential Information hereunder.

"*Patents*" means those patents and patent applications identified in *Exhibit A* and (a) any national, regional and international patents and patent applications corresponding to the patents and patent applications in *Exhibit A*; (b) all patent applications filed from such patents or pending patent applications on *Exhibit A*, including, divisionals, continuations, continuations-in-part, and continued prosecution applications, but excludes any patents and patent applications with one or more common provisionals; (c) any and all patents that have issued, or in the future will issue, from the foregoing patent applications included in subpart (a) and (b); and (d) any and all extensions or restorations by existing or future extension or restoration mechanisms, including revalidations, reissues, re-examinations and extensions (including any supplementary protection certificates and the like) of the foregoing patents or patent applications ((a), (b) and (c)).

"*Prosecution History Files*" means all files, documents and tangible things, as those terms have been interpreted pursuant to rules and laws governing the production of documents and things, constituting, comprising or relating to the investigation, evaluation, preparation, prosecution, maintenance, defense, filing, issuance, registration, assertion or enforcement of the Patents.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EVOLVED-0213181

*"Tablets"* means a portable computer device having a touch screen as the primary user interface excluding the Mobile Communication Products.

*"Tablet Business"* means a division of Seller which includes making or selling Tablets under Seller's internal organization.

*"Transmitted Copy"* has the meaning set forth in paragraph 12.11.

**3.    TRANSMITTAL, REVIEW, CLOSING CONDITIONS AND PAYMENT**

3.1    Closing. Purchaser and Seller will use reasonable efforts to carry out the sale of the Patents (the *"Closing"*) upon a day mutually agreed upon by the parties in writing on or before February 7, 2014. The parties' obligations that must be completed by seven (7) calendar days prior to the Closing are as follows: (a) Seller has delivered to Purchaser all of the Deliverables to the extent that they exist and are under Seller's possession or control; (b) Seller and Purchaser have performed and complied in all material respects with all of the obligations under this Agreement that are to be performed or complied with by it on or prior to the Closing, (c) each party has caused a copy of the Executed Assignments to be deliverable to Purchaser; and (d) there shall have been no material adverse changes relating to the Patents.

3.2    Thorough Search.    Except with respect to the original ribbon copy or certificate of invention for each issued Patent issued by the United States Patent and Trademark Office or other jurisdictional patent office, if originals of the Deliverables are not available and delivered to Purchaser prior to Closing, Seller will cause such originals of the Deliverables to be sent to Purchaser or Purchaser's representative promptly if and after such originals are located.

3.3    Termination.    In the event that the Closing has not occurred by February 7, 2014, either Party may terminate this Agreement by written notice to the other Party.   Upon termination, Purchaser shall return all Deliverables received from Seller hereunder.   The provisions of Section 9 will survive such termination.

3.4    Payment.    At Closing, Purchaser will pay to Seller the amount of fifteen million ($15,000,000) U.S. Dollars by wire transfer (the "Payment").    At least five (5) business days prior to Closing, Seller will deliver Purchaser with all necessary information to make a wire transfer to a designated bank account of Seller.

(a) The Parties further agree to the following additional payment terms: For purposes of Section 3.4(b) and (c), the term "Single Mode Chipsets" shall mean chipsets, or equivalent products, that are both (i) capable of initiating and/or receiving communications transmissions in accordance with OFDM standards, which shall mean Qualcomm's FLASH-OFDM, IEEE 802.16 (commonly referred to as WiMax), WiBro, IEEE 802.20, Ultra Mobile Broadband (formerly referred to as Rev. C), the fourth generation OFDMA-based wireless cellular specification under development in the Third Generation partnership Project ("3GPP") and commonly referred to as LTE (regardless of whether ultimately adopted and/or developed within NGMN, ETSI, 3GPP, Third Generation Partnership Project 2 ("3GPP2") or any other industry organization) and any other wireless air interface specifications that are substantially the same as any of the foregoing, including evolutions, updates and/or revisions to any of the foregoing and (ii) **not** capable of initiating and/or receiving "Wireless" communications. "Wireless" includes, without limitation, (a) any CDMA-based wireless wide area standard, including the CDMA2000family of standards (e.g., 1xRTT, 1x-EVDO,

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EVOLVED-0213182

EW_ITC-0628688

1x-EVDO Rev. A, 1x-EVDO Rev. B, BCMCS),the WCDMA family of standards (e.g., UMTS, HSPA, HSPA+, HSDPA, HSUPA, MBMS,TD-CDMA) and TD-SCDMA; and (b) any updates or revisions to any of the foregoing.   The term "Qualcomm" means Qualcomm, Inc. and its wholly-owned subsidiaries, affiliates, and third party contractors.

(b)    If for calendar year 2018,Qualcomm's total shipped units of Single Mode Chipsets constitutes more than ten percent (10%) of Qualcomm's total shipped units of LTE chipsets for that respective calendar year, then Seller will pay Purchaser three million ($3,000,000) U.S. Dollars.   Purchaser will provide notice to Seller that such event has occurred within six (6) months from publication of the information set forth in Section 3.4(d) below.   This payment shall be made by Seller to Purchaser within sixty (60) business days from the date on which the notice was received.   The Seller shall only be required to make one payment under this provision.   If payment is made under this section, Section 3.4(c) below becomes null and void.

(c)    If for each of calendar year 2019 and 2020, Qualcomm's total shipped units of Single Mode Chipsets constitutes equal to or less than ten percent (10%) of Qualcomm's total shipped units of LTE chipsets, then Purchaser will pay Seller three million ($3,000,000) U.S. Dollars.   Seller will provide notice to Purchaser that such event has occurred within six (6) months from publication of the information set forth in Section 3.4(d) below. This payment shall be made by Purchaser to Seller within sixty (60) business days from the date on which the notice was received.   The Purchaser shall only be required to make one payment under this provision.

(d)    The Parties agree that the underlying information for determining the percentages in Section 3.4(b) and (c) shall be obtained from industry related reports issued and made available to the public by research analytics firms: , ABI Research and Strategy Analytics. If either ABI Research or Strategy Analytics ceases to make these or similar reports available to the public, then Purchaser will identify a replacement reporting agency.   In determining the percentages in Sections 3.4(b) and (c), the parties will use the average of the reports referenced in Sections 3.4(d) above.

3.4.1    The parties acknowledge that nothing in Section 3 reflects a royalty rate for any of the Patents and is in no way related to the amount an infringer would pay to acquire a license to one or more of the Patents or that would otherwise be recoverable in any action to enforce one or more of the Patents.

(a)    Prior to executing this Agreement, Purchaser represents that it has not had access to any non-public information relating to factors that would be relevant to assessing any amounts that may be awarded in connection with any effort to license or enforce the Patents to or against any third-party, including without limitation:    rates paid by any infringer for use of other similar patents; the nature or scope of any hypothetical license to any infringer, such as whether the hypothetical license is restricted or non-restricted in terms of territory or customers; the commercial relationship between any infringer and any of the owners of the Patents; the effect of selling the patented specialty in promoting sales of other products; the existing value of any of the patented inventions as a generator of sales of nonpatented items; the extent of derivative or "convoyed" sales; the duration of any of the Patents at the time of any hypothetical negotiation with any infringer or the term of any hypothetical license; the established profitability of any product or method covered by any of the Patents, or the commercial success or popularity of any such product or method at the time of any hypothetical license negotiation; the utility or advantages of the inventions covered by any of the Patents over old modes of devices that had been used at the time of any hypothetical license negotiation; the nature of the inventions covered by any of the

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Patents or their character in any commercial embodiment, or the benefits to those who have used it; the extent to which any infringer used the invention claimed in any of the Patents or any evidence probative of the value of that use; the portion of the profit or selling price that is customary in the particular business of any infringer or in any comparable businesses; the portion of the profit realized by any infringer that should be credited to the inventions claimed in any of the Patents as distinguished from any nonpatented elements, manufacturing processes, business risks or significant features or improvements added by any infringer; the opinion testimony of any qualified experts; or the amount any infringer would have agreed upon at the time the infringement began had it reasonably and voluntarily tried to reach an agreement.

(b)    While neither Seller nor Purchaser is aware of any facts that would support a claim that any of the Patents is either invalid or unenforceable, there has been no final adjudication as to the validity, enforceability, or infringement of any of the Patents.  For the purpose of their negotiation, neither Seller nor Purchaser have definitively agreed that any of the Patents are valid, enforceable, or infringed.

(c)    Seller and Purchaser acknowledge that license negotiations and litigation relating to patent enforcement often take extended periods of time to conclude, and in negotiating the Payment Seller and Purchaser have expressly taken into account the uncertainty and extended delay likely necessary to conclude any such patent enforcement efforts.

(d)    Seller and Purchaser acknowledge that in negotiating the Payment, the Seller and Purchaser have expressly taken into account the substantial uncertainty in the relevant markets as they currently exist and the substantial uncertainty regarding factors likely to impact use of the patented technology in coming years.

## 4.    TRANSFER OF PATENTS AND LICENSE BACK TO SELLER

4.1    <u>Assignment of Patents</u>.    Upon the Closing, Seller hereby sells, assigns, transfers, and conveys to Purchaser all right, title, and interest in and to the Patents subject only to those Encumbrances identified in Exhibit B, and to the extent that one or more of the Patents may be subject to obligations set forth by the standard setting organization 3GPP and/or ETSI. On or before Closing, Seller will execute and deliver to Purchaser the Assignment of Patent Rights in the form set forth in ***Exhibit A*** (as may be updated based on Purchaser's review pursuant to paragraph 3.1).

4.2    <u>Assignment of Additional Rights</u>.    Upon the Closing, Seller hereby also sells, assigns, transfers, and conveys to Purchaser all right, title and interest in and to all:

(a)    rights to prosecute, maintain and defend the Patents before any public or private agency, office or registrar including by filing reissues, reexaminations, divisionals, continuations, continuations-in-part, substitutes, extensions and all other applications and post issue proceedings included in the Patents and rights to claim priority based on the filing dates of any of the Patents;

(b)    causes of action (whether known or unknown or whether currently pending, filed, or otherwise) and other enforcement rights under, or on account of, any of the Patents and/or the rights described in subparagraph 4.2(a), including, without limitation, all causes of action and other enforcement rights for (i) damages, (ii) injunctive relief, and (iii) any other remedies of any kind for past, current and future infringement;

(c)    rights to cooperation relating to any of the Patents, including without limitation any

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    EVOLVED-0213184

such rights owed to Seller by any inventor or previous owner of the Patents; and

(d)    rights to collect and seek royalties or other payments under or on account of any of the Patents and/or any of the foregoing rights in this paragraph 4.2.

Seller also conveys to Purchaser the right to use any provisional patent applications from which any of the Patents claim or derive priority for the purposes of prosecuting, maintaining and defending the Patents before any public or private agency, office or registrar including by filing reissues, reexaminations, divisionals, continuations, continuations-in-part, substitutes, extensions and all other applications and post issue proceedings included in the Patents and rights to claim priority based on the filing dates of any such provisional.

4.3    License Back to Seller under Patents.

(a)    Upon the Closing, Purchaser hereby grants to Seller and its affiliates, under the Patents, and for the lives thereof, a royalty-free, non-exclusive, non-sublicensable, irrevocable, non-transferable (except as provided below) right and license ("***Seller License***") to practice the methods and to make, have made, use, distribute, lease, sell, offer for sale, import, export, develop and otherwise dispose of and exploit Seller products covered by the Patents that are designed and developed by Seller, regardless of trademarks or brands thereof. The Seller License shall apply to the reproduction and subsequent distribution of Seller products under Seller's trademarks and brands, in substantially identical form as they are distributed by the Seller, by authorized agents of the Seller, such as a distributor or OEM. In addition, Seller License shall extend to the use or employment of Seller products purchased from Seller by Seller's customers, provided, however, that (i) only Seller products are licensed, and (ii) the use or sale of that portion of a product or service by Seller's customers that is not a Seller product shall not be licensed. Seller acknowledges and agrees that the Seller License is not intended to cover foundry or contract manufacturing activities that Seller may undertake on behalf of any person that is not Seller. As a result, Seller products shall exclude any products or services manufactured, produced or provided by Seller on behalf of any person that is not Seller (a) from designs received in substantially completed form from a source other than Seller and (b) for resale to such person that is not Seller (or to customers of, or as directed by, any person that is not Seller) on essentially an exclusive basis.

(b)    If there is a change of control transaction of a merger involving the sale of all, or substantially all, of the outstanding capital stock of Seller, the surviving entity will be entitled to the Seller License that is further limited to the extent of what Seller was selling at the time of the merger and any subsequent versions of those same products, and shall be limited to the number of Seller products and any subsequent versions of those same products, and the scale of Seller's activity in Seller products and any subsequent versions of those same products, at the time of the merger, and provided that the sale or use of that portion of any subsequent versions of those same products that is not a Seller product shall not be licensed.

(c)    If there is a change of control transaction wherein an entity is either the purchaser of one or both of (i) all or substantially all of the operating assets related to Seller's Mobile Communication Business, and/or (ii) all or substantially all of the operating assets related to Seller's Tablet Business, and Seller has decided to retain the Seller License, Purchaser will provide the entity a royalty-free, non-exclusive, non-sublicensable, non-transferable license to the Patents ("Grace License") that is limited in scope as the Seller License in Sec. 4.3(a) plus the restrictions set forth herein.    The Grace License will expire one year from the closing date for the change of control transaction.    The Grace License shall be

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    EVOLVED-0213185

EW_ITC-0628691

further limited to Seller products that Seller was selling at the time of the acquisition and any subsequent versions of those same products, and shall be limited to the number of Seller products and any subsequent versions of those same products, and the scale of Seller's activity in Seller products and any subsequent versions of those same products, at the time of the change of control transaction, and provided that the sale or use of that portion of any subsequent versions of those same products that is not a Seller product shall not be licensed.   Purchaser will negotiate in good faith with the entity for a license of the Patents that may extend beyond the one year period provided herein.   If Seller transfers the Seller License to the entity in the change of control transaction, then no Grace License is created and Seller will not have a license to the Patents.   To be clear, a sale of either Seller's Mobile Communication Business or Seller's Tablet Business will result in one Grace License being created and no future Grace License will be available for any subsequent sale of the other business unit.

(d)      Seller will provide written notice to Purchaser at least thirty (30) calendar days prior to the closing of any change of control transaction described in Sec. 4.3(b) or (c), and such notice will state whether Seller is retaining the Seller License provided in Sec. 4.3(a).

## 5.      ADDITIONAL OBLIGATIONS

5.1      <u>Further Cooperation</u>.

(a)      At the reasonable request of Purchaser, Seller will execute and deliver such other instruments and do and perform such other acts and things as may be necessary or desirable for effecting completely the consummation of the transactions contemplated hereby, including, without limitation, execution, acknowledgment, and recordation of other such papers, and using commercially reasonable efforts to obtain the same from the respective inventors, as necessary or desirable for fully perfecting and conveying unto Purchaser the benefit of the transactions contemplated hereby.

(b)      To the extent any attorney-client privilege or the attorney work-product doctrine applies to any portion of the Prosecution History Files and that is retained after Closing under Seller or Seller's representatives' normal document retention policy, Seller will ensure that, if any such portion of the Prosecution History File remains under Seller's possession or control after Closing, it is not disclosed to any third party unless (a) disclosure is ordered by a court of competent jurisdiction, after all appropriate appeals to prevent disclosure have been exhausted, and (b) Seller gives Purchaser prompt notice upon learning that any third party sought or intended to seek a court order requiring the disclosure of any such portion of the Prosecution History File.   In addition, Seller will continue to prosecute, maintain, and defend the Patents at its sole expense until the Closing.

(c)      Seller will also, at the reasonable request of Purchaser after Closing to 5 years thereafter and with the Purchaser to reimburse out of pocket costs or expenses incurred by Seller, assist Purchaser, using commercially reasonable efforts, in providing, and obtaining, from the respective inventors so long as they are in Seller's employ at the time of such request, prompt production of pertinent facts and documents, otherwise giving of testimony, execution of petitions, oaths, powers of attorney, specifications, declarations or other papers and other assistance reasonably necessary for filing patent applications, enforcement or other actions and proceedings with respect to the claims under the Patents.

5.2      <u>Recordation</u>.   Purchaser shall promptly cause the Assignment of Patent Rights to be recorded, at its own expense, with the United States Patent and Trademark Office and any other applicable patent offices.

CONFIDENTIAL - ATTORNEYS' EYES ONLY          EVOLVED-0213186

EW_ITC-0628692

5.3     Payment of Fees.    Seller will pay any maintenance fees, annuities, and the like due or payable on the Patents until the Closing.    For the avoidance of doubt, Seller shall pay any maintenance fees for which the fee is payable (e.g., the fee payment window opens) on or prior to the Closing even if the surcharge date or final deadline for payment of such fee would be after the Closing. Seller hereby gives Purchaser power-of-attorney to (a) execute documents in the name of Seller in order to effectuate the recordation of the transfers of any portion of the Patents in an governmental filing office in the world and (b) instruct legal counsel to take steps to pay maintenance fees and annuities that Seller declines to pay and to make filings on behalf of Seller prior to Closing and otherwise preserve the assets through Closing.

5.4     Foreign Assignments.    To the extent the Patents include non-United States patents and patent applications, Seller will deliver to Purchaser's representatives executed documents in a form as may be required in the non-U.S jurisdiction in order to perfect the assignment to Purchaser of the non-U.S. patents and patent applications.

5.5     Obligation of Purchaser.    Purchaser acknowledges that Seller has represented that it has properly disclosed the Patents to ETSI and committed to certain licensing obligations with respect to the licensing of standards-essential Patents to ETSI. Purchaser further acknowledges the obligations under the covenants not to assert Seller's OFDM Intellectual Property granted pursuant to Section 4.3.1 through 4.3.3 of the agreement between Seller and Qualcomm, effective as of January 1, 2007 ("OFDM Agreement"), a partial and redacted copy of which has been provided to Purchaser.    Purchaser is not able to acknowledge or agree to any obligation or existence of any fact related to the Agreement between Seller and Qualcomm that was not disclosed in the redacted copy.

## 6.    REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser as follows that, as of the Effective Date and as of the Closing:

6.1     Authority.    Seller is a company duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation.    Seller has the full power and authority and has obtained all third party consents, approvals, and/or other authorizations required to enter into this Agreement and to carry out its obligations hereunder, including, without limitation, the assignment of the Assigned Patent Rights to Purchaser.    This Agreement is the legal, valid and binding obligation of Seller enforceable against Seller in accordance with its respective terms.    The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby or compliance with or fulfillment of the terms and provisions hereof or of any other agreement or instrument contemplated hereby, does not and will not conflict with or result in a breach of any contract, agreement or judgment, order or rule, law, or regulation of any governmental authority to which Seller is a party or which may affect Seller.

6.2     Title and Contest.    Seller owns all right, title, and interest to the Assigned Patent Rights, including, without limitation, all right, title, and interest to sue for infringement of the Patents and seek past and future damages from a third party.    Seller has obtained and properly recorded previously executed assignments for the Patents as necessary to fully perfect its rights and title therein in accordance with governing law and regulations in each respective jurisdiction.    There are no actions, suits, investigations, claims, or proceedings threatened, pending, or in progress relating in any way to the Assigned Patent Rights.    There are no existing contracts, agreements, options, commitments, or rights with, to, or in any person to acquire any of the Assigned Patent Rights in effect on or after the Effective Date.

6.3     Existing Licenses and Obligations.    None of the Assigned Patent Rights have been declared essential to any standard of any standard setting organization, except the Patents may have been declared essential to the standard setting organization ETSI as set forth in *Exhibit C*.    Nevertheless, none of the Patents, excluding those indicated in ***Exhibit A***, have been evaluated or submitted for review related to a determination that such Patents are essential for practicing a standard related to cellular telecommunications.    Further, none of the Patents have been determined to be non-essential for practicing a standard related to cellular telecommunications.

Except for the Encumbrances listed in Exhibit B and the Seller License in Section 4.3, no licenses or covenants under the Assigned Patent Rights have been granted or retained by Seller, any prior owner, or any inventor. None of the Encumbrances in Exhibit B is an exclusive license or grant to any of the Assigned Patent Rights. After Closing, none of Seller, any prior owner, or any inventor will retain any rights or interest in the Assigned Patent Rights. Except for the Encumbrances identified in Exhibit B and Section 7.4 of this Agreement, Purchaser will not be subject to any covenant not to sue or similar restrictions on its enforcement or enjoyment of the Assigned Patent Rights as a result of any prior transaction related to the Assigned Patent Rights.    The OFDM Agreement between Seller and Qualcomm, effective as of January 1, 2007, as amended from time to time, only provides a license to the Patents for Single Mode Chipsets.

6.4     No Assignment or Sublicense of Rights to Third Parties.    Except as listed in Exhibit B, no Encumbrances related to the Assigned Patent Rights may be assigned, transferred, or sublicensed to any entity, including through a change of control, and that Seller will not agree to such assignment, transfer, or sublicense of any Encumbrances. In the event of a change of control of Seller, Seller will require that the new entity shall only be able to assume the obligations and rights provided in the agreements identified in Exhibit B. None of the Encumbrances listed in Exhibit B include any right to expand, enlarge, or enhance the obligations and rights in such agreements identified in Exhibit B as it relates to the Assigned Patent Rights in the event of a change of control of Seller, including not assigning, transferring, or sublicensing the Assigned Patent Rights to any third party.

6.5     No Determination of a Royalty Rate. With respect to the Encumbrances in Exhibit B, Seller represents that:

(a) Seller has not entered into any license, covenant or other agreement which provides for payment of a royalty or other monetary consideration to Seller for any of the Patents.

(b) Seller has not offered to enter or engaged in any communications regarding any potential license, covenant, or other agreement which would provide for payment of a royalty rate or other monetary consideration to Seller for any of the Patents.

(c) Seller has not received any offer or communications regarding any potential license, covenant, or other agreement which would provide for payment of a royalty rate or other monetary consideration to Seller for any of the Patents.

(d) Seller has not analyzed, assessed or determined any royalty or other monetary consideration that may apply to any actual or potential license, covenant or other agreement for any of the Patents.

(e) Seller has not received any analysis, assessment, or determination of any royalty or other monetary consideration that may apply to any actual or potential license, covenant or other agreement for any of the Patents.

6.5.1     Seller represents, except for information disclosed by Seller as of the Effective Date,

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EVOLVED-0213188

that to its Knowledge that it has not agreed, offered, or suggested any royalty rates, monetary consideration, or other consideration specifically in relation to the licensing, sale, or transfer of Patents or any other patents or patent applications deriving priority from the same provisional applications as that of the Patents. Purchaser understands that any disclosure under this warranty is subject to third party confidentiality restrictions applicable to Seller. To the extent that any further information comes to its Knowledge or is already within its Knowledge as at the date of Closing as to any agreed, offered, or suggested any royalty rates, monetary consideration, or other consideration specifically in relation to the licensing, sale, or transfer of Patents or any other patents or patent applications deriving priority from the same provisional applications as that of the Patents and such information is subject to any third party confidentiality restrictions, Seller will notify Purchaser orally (as opposed to in writing) of the level of such royalty rates, monetary consideration, or other consideration but may withhold details of the third party concerned or product information concerned to the extent Seller believes such disclosure would be in breach of the third party confidentiality restrictions. If a disclosure under this provision occurs less than seven (7) calendar days before the date of the Closing, the Closing will be advanced seven calendar days.

6.6    Validity and Enforceability. None of the Patent have ever been found invalid, unpatentable, or unenforceable for any reason in any administrative, arbitration, judicial or other proceeding to which Seller was a party, and Seller or inventors do not know of and has not received any notice or information of any kind from any source suggesting that the Patents may be invalid, unpatentable, or unenforceable. Seller is not aware of any information, undisclosed prior art to any patent issuing agency or department, or other documents that would support an assertion the Patent may be invalid, unpatentable, or unenforceable. If any of the Assigned Patent Rights are terminally disclaimed to another patent or patent application, all patents and patent applications subject to such terminal disclaimer are included in this transaction. Seller represents that none of the Patents were obtained by paying fees as a "small entity."

6.7    Conduct. Seller (including its professional advisors and patent agents) has not engaged in any conduct or instructed any third party to engage in any conduct which would invalidate any of the Patents or support an assertion of misrepresentation of the Patents to a standard-setting organization. Seller (including its professional advisors and patent agents) has not omitted to perform any necessary act or prevented any third party performing any necessary act, the result of which would invalidate any of the Patents or prevent their enforcement, including, without limitation, misrepresenting the Patents to a standard-setting organization.

6.8    Enforcement. Except as disclosed in Exhibit B, Seller or its representatives or agents have not put a third party on notice of actual or potential infringement concerning the Patents. Except as disclosed in Exhibit B, Seller has not invited any third party to enter into a license for any of the Patents. Seller or prior owner has not initiated any enforcement action with respect to any of the Patents..

6.9    Patent Office Proceedings. None of the Patents have been or is currently involved in any *inter partes* review, derivation, covered business method, reexamination, reissue, interference proceeding, supplemental examination, or any similar proceeding, and no such proceedings are pending or threatened. Seller shall not suggest, recommend, plan, initiate, execute, assist, or participate in any *inter partes* review, derivation, covered business method, reexamination, reissue, interference proceeding, supplemental examination, or any similar proceeding before the United States Patent and Trademark Office or similar governmental agency, domestic or foreign, related to any of the Assigned Patent Rights,

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    EVOLVED-0213189

unless requested by Purchaser.

6.10     Fees.    All maintenance fees, annuities, and the like due or payable on the Patents have been timely paid.    For the avoidance of doubt, such timely payment includes payment of any maintenance fees for which the fee is payable (e.g., the fee payment window opens) even if the surcharge date or final deadline for payment of such fee would be in the future.

6.11     Brokers' or Finders' Fees.    Except with respect to Iceberg Capital Partners, Seller has not incurred, nor will it incur, directly or indirectly, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with this Agreement or the transactions contemplated herein.    Purchaser is under no obligation to make any payment to Iceberg Capital Partners.    Included as Exhibit D is a Release to be executed and provided at Closing by Iceberg Capital Partners.

6.12     Disclaimer of Warranties. The Patents are provided "AS IS" to Purchaser.    Except as expressly provided in this Agreement, Seller makes no warranties whatsoever regarding the Patents.    WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, AND EXCEPT AS OTHERWISE SET OUT ABOVE, THERE ARE NO OTHER WARRANTIES PROVIDED BY SELLER, EXPRESS OR IMPLIED, AND NOTHING IN THIS AGREEMENT SHALL BE CONSTRUED AS A WARRANTY OR REPRESENTATION OF ANY KIND OR NATURE BY SELLER AS TO THE VALIDITY, ENFORCEABILITY, SCOPE OR SUITABILITY FOR ANY PURPOSE OF ANY PATENT ASSIGNED HEREUNDER; THE MERCHANTABILITY OF THE TECHNOLOGY CLAIMED IN SUCH PATENTS; A WARRANTY OR REPRESENTATION THAT ANYTHING MADE, USED, SOLD, OR OTHERWISE DISPOSED OF UNDER ANY PATENT ASSIGNED IN THIS AGREEMENT IS OR WILL BE FREE FROM INFRINGEMENT OF PATENTS OF THIRD PARTIES; OR GRANTING BY IMPLICATION, ESTOPPEL, OR OTHERWISE ANY LICENSES OR RIGHTS UNDER ANY PATENTS OR OTHER INTELLECTUAL PROPERTY OTHER THAN THE PATENTS EXPRESSLY DEFINED IN THIS AGREEMENT.

7.     **REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser hereby represents and warrants to Seller as follows that, as of the Effective Date and as of the Closing:

7.1     Purchaser is a limited liability company duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation. This Agreement is the legal, valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its respective terms.

7.2     Purchaser has the full power and authority and has obtained all third party consents, approvals, and/or other authorizations required to enter into this Agreement and to carry out its obligations hereunder. This Agreement is the legal, valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its respective terms.    The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby or compliance with or fulfillment of the terms and provisions hereof or of any other agreement or instrument contemplated hereby, does not and will not conflict with or result in a breach of any contract, agreement or judgment, order or rule, law, or regulation of any governmental authority to which Purchaser is a party or which may affect Purchaser.

7.3     Purchaser has sufficient funds to effect the Closing on the terms contemplated hereby.

7.4     Purchaser agrees and covenants that Purchaser shall not, directly or indirectly, seek to obtain economic, equitable, or other judicial or extra-judicial relief for an infringement of any Patents from any

Carrier with respect to any alleged infringement or other use of any Patents in connection with such Carrier's business.   This agreement and covenant shall not restrict Purchaser's ability to comply with any obligation to offer or grant a license to any standards essential patents.   "Carrier" means any person or entity that is engaged, as its primary business, in operating any tele-, data- or broadcast-communication network infrastructure to provide tele-, data- or broadcast-communication services to subscribers of such services. To be clear, Purchaser is not offering or giving a license to any Carrier for the Patents in this provision. This agreement and covenant shall not restrict Purchaser's ability to comply with any obligations to offer or grant a license to any declarer standards essential patents in the Patents. Neither Seller nor Purchaser received any financial consideration as part of this Agreement based upon this provision. This provision is not indicative or suggestive of the value of the Patents by Seller or Purchaser. This provision is solely for the benefit of Seller and does not create any third-party beneficiary of this Agreement, This provision is provided in view of the Seller's long-standing and extensive relationship with the Carriers. For the avoidance of doubt, nothing herein shall limit in any way Purchaser's ability to pursue claims for contributory or induced infringement against any non-Carrier provided that Purchaser does not seek relief directly from a Carrier.

## 8.    SURVIVAL OF REPRESENTATIONS

8.1    <u>Survival of Representations.</u> The representations, warranties, and agreements, of each of the Parties contained in this Agreement and in any schedules or certificates delivered pursuant hereto, shall survive the consummation of the transactions contemplated by this Agreement for a period equal to the applicable statute of limitations; provided that, notwithstanding the foregoing, the representations and warranties contained in Sections 6 and 7 shall expire on five years after the anniversary date of the payment made pursuant to Section 3.4.   Thereafter, all such representations and warranties shall be extinguished and no claim for the recovery of any losses may be asserted against Seller or Purchaser in respect thereof. Such representations, warranties, and agreements shall not be affected or deemed waived by reason of the fact that a party seeking to enforce the same knew that the same are or may be inaccurate.

## 9.    CONFIDENTIALITY AND COMMON INTEREST

9.1    <u>Confidential Information.</u>

(a)    The Recipient shall use its best efforts (but in any event not less than those employed for safeguarding its own proprietary information) to keep the Confidential Information and/or any knowledge which may be imparted through examination thereof or working therewith confidential.

(b)    The Recipient shall not disclose or otherwise make available any of the Confidential Information to anyone, including employees, contractors and representatives, except those employees, contractors and representatives of the Recipient and entities controlled by, controlling or under common control with the Recipient who need to know the Confidential Information for the purpose of meeting Recipient's obligations under this Agreement or exercising its rights under this Agreement, and who are bound by obligations of non-use and non-disclosure substantially similar to those set forth herein.   The Recipient shall be responsible for any use or disclosure of the Confidential Information by such employees, contractors, representatives or commonly controlled entities.

9.2    <u>Permitted Disclosures.</u>   The Recipient may disclose the Confidential Information (a) to the extent that such disclosure is required by law or court order, provided that the Recipient shall promptly provide to the Discloser written notice prior to such disclosure and shall provide reasonable assistance in

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    EVOLVED-0213191

EW_ITC-0628697

obtaining an order or other remedy protecting the Confidential Information from public disclosure; (b) in confidence to its legal counsel, accountants, banks, and financing sources and their advisors solely in connection with complying with or administering its obligations with respect to this Agreement; (c) by Purchaser, to potential purchasers or licensees of the Assigned Patent Rights ; (d)   in order to perfect Purchaser's interest in the Patents with any governmental patent office (including, without limitation, recording the Executed Assignments in any governmental patent office); or (e) to enforce Purchaser's right, title, and interest in and to the Assigned Patent Rights, subject to entry of a suitable protective order. Notwithstanding the provisions of this Section 9.2, the parties agree that either Party may issue, with a prior written consent of the other party, a press release announcing the transaction effected by this Agreement.

9.3     Injunctive Relief.    Each Party acknowledges that disclosure of the other Party's Confidential Information by it or breach of the provisions contained herein may give rise to irreparable injury to the other Party and such breach or disclosure may be inadequately compensable in money damages. Accordingly, each Party may seek injunctive relief against the breach or threatened breach of the foregoing undertakings.    Such remedy will not be deemed to be the exclusive remedy for any such breach but will be in addition to all other remedies available at law or equity.

## 10.    REMEDIES

10.1    Breach.    In the event of a dispute between Seller and Purchaser where Seller is alleged to be in material breach of any of its representations, warranties or covenants contained in this Agreement (including any breach of the obligation to provide Deliverables under clause 3.1), the parties shall negotiate in good faith to resolve the dispute upon notice by Purchaser for up to sixty (60) days. In the event Seller is in material breach of any of its representations, warranties or covenants contained in this Agreement, then Purchaser may, in its sole discretion, return the Assigned Patents Rights to Seller and receive from Seller the full amount of Cumulative Payments to Seller if the Net Proceeds are less than or equal to zero.    If the Net Proceeds are greater than zero, then Seller shall pay Purchaser the full amount of Cumulative Payments less the Net Proceeds. For this section, "Cumulative Payments" means all payments made to Seller by Purchaser. "Net Proceeds" shall mean the total revenues or recoveries received by Purchaser from third parties with respect to the Assigned Patent Rights including in the form of damages, license fees, royalties, third party acquisition proceeds, property or services, or other monetary compensation obtained through enforcement and/or assertion of the Assigned Patent Rights, whether through agreement, settlement, judgment or otherwise, less Expenses. For this section, "Expenses" shall mean the reasonable and actual third party out-of-pocket expenses, and fees paid or incurred, including legal fees and expert fess, and related to the maintenance, licensing, management, prosecution, enforcement, and defense of the Assigned Patent Rights.

10.2    Records; Audits.    Purchaser shall maintain, and shall cause its successors and assigns,   to maintain, complete and accurate records in sufficient detail to permit Seller to confirm the accuracy of Net Proceeds, if any, due under this Agreement.    Upon a dispute arising related to this Agreement that is not resolved within the time period provided in Sec. 10.1, and upon reasonable prior written notice, such records and the records maintained by Purchaser (or its successors and assigns) with respect to the Assigned Patent Rights hereunder, shall be open for examination during regular business hours by an independent certified public accountant selected by Seller, for the sole purpose of verifying the accuracy of the Net Proceeds.    Any amounts shown to be incorrect, either in favor of Purchaser or Seller, shall be paid within thirty (30) days after the accountant's written report is provided to both Seller and Purchaser (or its successors and assigns).    Seller shall bear the full cost of such examination unless such audit reveals an underestimation by Purchaser of more than 5 percent (5%) of the Net Proceeds, in which case Purchaser shall bear the full cost of such audit.

10.3    Rights and Remedies.    Except in the case of fraud, the rights and remedies of the Purchaser under this Section 10 are the exclusive rights and remedies under this Agreement, and are in lieu of any and all other rights and remedies available to Purchaser under applicable law or otherwise, and each Party expressly waives, on behalf of itself and its affiliates, any and all other rights or causes of action that it or any of its affiliates may have against the other Party now or in the future under any applicable law with respect to any matter under this Agreement. For clarity and except in the case of fraud or willful or fraudulent misrepresentation, where amount of Net Proceeds equals or exceeds the Cumulative Payments to Seller, the remedies set out in Section 10.1 shall cease to apply and Purchaser shall have no further remedy or rights as against Seller under Section 10.1.

## 11.    LIMITATION OF LIABILITY

EXCEPT IN THE CASE OF A WILLFUL OR FRAUDULENT MISREPRESENTATION UNDER THIS AGREEMENT OR A REMEDY UNDER SECTION 10, IN NO EVENT WILL ANY OF THE PARTIES BE LIABLE FOR ANY INDIRECT, PUNITIVE, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT, OR FOR LOSS OF PROFITS OR ANY OTHER ECONOMIC LOSS, HOWEVER IT ARISES AND UNDER ANY THEORY OF LIABILITY, WHETHER IN AN ACTION FOR CONTRACT, WARRANTY, STRICT LIABILITY, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, REGARDLESS OF WHETHER THE PARTIES HAVE BEEN ADVISED ABOUT THE POSSIBILITY OF SUCH DAMAGE OR LOSS AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY REMEDY.    THE PARTIES ACKNOWLEDGE THAT THESE EXCLUSIONS OF POTENTIAL DAMAGES AND LOSSES WERE AN ESSENTIAL ELEMENT IN ESTABLISHING THE CONSIDERATION UNDER THIS AGREEMENT. . NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT AND EXCEPT IN THE CASE OF A WILLFUL OR FRAUDULENT MISREPRESENTATION UNDER THIS AGREEMENT, IN NO EVENT WILL SELLER'S CUMULATIVE AGGREGATE LIABILITY UNDER THIS AGREEMENT FOR PURCHASER, AND ITS OFFICERS, DIRECTORS, EMPLOYEES, REPRESENTATIVES, MEMBERS, SHAREHOLDERS, AGENTS AND SUCCESSORS AND ASSIGNEES OF SELLER EXCEED THE CUMULATIVE PAYMENTS TO SELLER (LESS IF APPLICABLE ANY NET PROCEEDS IN ACCORDANCE WITH CLAUSE 10.1).

## 12    MISCELLANEOUS

12.1    Compliance With Laws.    Notwithstanding anything contained in this Agreement to the contrary, the obligations of the parties with respect to the consummation of the transactions contemplated by this Agreement shall be subject to all laws, present and future, of any government having jurisdiction over the parties and this transaction, and to orders, regulations, directions or requests of any such government.

12.2    Governing Law; Venue/Jurisdiction.    The construction, performance and interpretation of this Agreement shall be governed by the U.S. patent laws, and the substantive laws of the State of New York for agreements to be wholly performed therein, without regard to its principles of conflicts of laws; provided that if the foregoing laws should be modified in such a way as to adversely affect the original intent of the parties, the parties will negotiate in good faith to amend this Agreement to effect their original intent as closely as possible.    Seller and Purchaser irrevocably submit to the exclusive jurisdiction of the state and federal courts located in New York for all actions and proceedings arising in connection with this Agreement, and agree that any such action or proceeding shall be brought only in such courts and waive any objection based on *forum non conveniens* or any other objection to venue therein.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    EVOLVED-0213193

EW_ITC-0628699

12.3    Notices.    All notices given hereunder will be given in writing (in English or with an English translation), will refer to Purchaser and to this Agreement and will be delivered to the address set forth below by (i) personal delivery, or (ii) delivery postage prepaid by an internationally-recognized express courier service:

| If to Purchaser | If to Seller |
|---|---|
| TQ Lambda LLC | LG Electronics, Inc. |
| 805 Las Cimas Parkway, Suite 240 | 19, Yangjae-daero 11gil, Seocho-gu |
| Austin, TX 78746 | Seoul 137-130, the Republic of Korea |
| | |
| Attn: Abha Divine | Attn: Jeong Hwan Lee |

And a copy to:

Robins, Kaplan, Miller &Ciresi LLP
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402

Attn:    Christopher K. Larus, Esq.

Notices are deemed given on (a) the date of receipt if delivered personally or by express courier or (b) if delivery is refused, the date of refusal.    Notice given in any other manner will be deemed to have been given only if and when received at the address of the person to be notified.    Either party may from time to time change its address for notices under this Agreement by giving the other party written notice of such change in accordance with this paragraph.

12.4    Relationship of Parties.    The parties hereto are independent contractors.    Nothing in this Agreement will be construed to create a partnership, joint venture, franchise, fiduciary, employment or agency relationship between the parties.    Neither party has any express or implied authority to assume or create any obligations on behalf of the other or to bind the other to any contract, agreement or undertaking with any third party.

12.5    Successors and Assigns.    Provided that the successors and assignees of Purchaser succeeds, buys or acquires all of the Assigned Patent Rights and their progeny, all covenants and agreements set forth in this Agreement and made by or on behalf of any of the parties hereto shall bind and inure to the benefit of the successors and assignees of such party, whether or not so expressed, except that the agreement and covenant in Section 7 shall not extend to any successor or assignee of Purchaser. In the event of any assignment, sale, transfer or exclusive license of all or any of the Assigned Patent Rights or their progeny by Purchaser to any third party, Purchaser shall ensure that the assignment, sale, transfer or exclusive license is subject to the licenses and rights reserved to the Seller in this Agreement.    Seller may not assign this Agreement or transfer its respective rights or obligations under this Agreement without the prior written consent of Purchaser.

12.6    Severability.    If any provision of this Agreement is found to be invalid or unenforceable, then the remainder of this Agreement will have full force and effect, and the invalid provision will be modified, or partially enforced, to the maximum extent permitted to effectuate the original objective.

12.7    Waiver.    Failure by either party to enforce any term of this Agreement will not be deemed a waiver of future enforcement of that or any other term in this Agreement or any other agreement that may

CONFIDENTIAL - ATTORNEYS' EYES ONLY

be in place between the parties.

12.8    Captions.    The captions in this Agreement are for convenience of reference only and shall not limit or otherwise affect any of the terms or provisions hereof.

12.9    Construction.    The parties have participated jointly in the negotiation and drafting of this Agreement.    In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. For purposes of this Agreement, (i) the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision, and (ii) whenever a covenant is qualified by the phrase "to be performed prior to the Closing," it shall not include any covenants expressly to be performed at the Closing.

12.10    Miscellaneous.    This Agreement, including its exhibits, constitutes the entire agreement between the parties with respect to the subject matter hereof and merges and supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions.    Neither of the parties will be bound by any conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof other than as expressly provided herein.    The section headings contained in this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement.    This Agreement is not intended to confer any right or benefit on any third party (including, but not limited to, any employee or beneficiary of any party), and no action may be commenced or prosecuted against a party by any third party claiming as a third-party beneficiary of this Agreement or any of the transactions contemplated by this Agreement.    No oral explanation or oral information by either party hereto will alter the meaning or interpretation of this Agreement.    No amendments or modifications will be effective unless in a writing signed by authorized representatives of both parties.    The terms and conditions of this Agreement will prevail notwithstanding any different, conflicting or additional terms and conditions that may appear on any letter, email or other communication or other writing not expressly incorporated into this Agreement.    The following exhibits are attached hereto and incorporated herein:    *Exhibit A* (entitled "Assignment of Patent Rights"), *Exhibit B* (entitled "Identification of Encumbrances"), Exhibit C (entitled "ETSI Declaration by LG Electronics"), and *Exhibit D* (entitled "Release by Iceberg Capital Partners").

12.11    Counterparts; Electronic Signature; Delivery Mechanics.    This Agreement may be executed in counterparts, each of which will be deemed an original, and all of which together constitute one and the same instrument.    Each party will execute and promptly deliver to the other parties a copy of this Agreement bearing the original signature.    Prior to such delivery, in order to expedite the process of entering into this Agreement, the parties acknowledge that a Transmitted Copy of this Agreement will be deemed an original document.    *"Transmitted Copy"* means a copy bearing a signature of a party that is reproduced or transmitted via email of a .pdf file, photocopy, facsimile, or other process of complete and accurate reproduction and transmission.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    EVOLVED-0213195

In witness whereof, intending to be legally bound, the parties have executed this Patent Purchase Agreement as of the date of signature below.

SELLER:                                                         PURCHASER:

**LG ELECTRONICS INC.**                              **TQ LAMBDA LLC**

By: _____                  By: _____

Name: JEONG HWAN LEE                            Name: ABHA S. DIVINE

Title: Executive Vice President                      Title: MANAGING DIRECTOR

Date: January 24, 2014                                   Date: January 30, 2014

**Effective Date: January 24, 2014**

CONFIDENTIAL - ATTORNEYS' EYES ONLY             EVOLVED-0213196

## EXHIBIT A - ASSIGNMENT OF PATENT RIGHTS

For good and valuable consideration, the receipt of which is hereby acknowledged, LG Electronics Inc., a Korean corporation with a business address of LG Twin Towers 20, Yoido-dong, Youngdungpo-gu, Seoul, South Korea, 150-721  (**"*Assignor*"**), does hereby sell, assign, transfer, and convey unto TQ Lambda   LLC, a Delaware limited liability company, with a business address of 805 Las Cimas Parkway, Suite 240, Austin TX 78746 (**"*Assignee*"**), or its designees, all right, title, and interest that exist today and may exist in the future in and to any and all of the following (collectively, the **"*Patent Rights*"**):

(a)      the patent applications and patents listed in the table below (the "*Patents*");

(b)      all patent applications filed from such patents or pending patent applications listed in the table below, including divisionals, continuations, continuations-in-part, and continued prosecution applications;

(c)      all reissues, reexaminations, extensions, continuations, continuations in part, continuing prosecution applications, requests for continuing examinations, divisions, registrations of any item in any of the foregoing categories (a) and (b);

(d)      all foreign patents, patent applications, and counterparts corresponding to any item in any of the foregoing categories (a) through (c);

(e)      all items in any of the foregoing in categories (b) through (d), whether or not expressly listed as Patents below and whether or not claims in any of the foregoing have been rejected, withdrawn, cancelled, or the like;

(f)      all causes of action (whether known or unknown or whether currently pending, filed, or otherwise) and other enforcement rights under, or on account of, any of the Patents and/or any item in any of the foregoing categories (b) through (e), including, without limitation, all causes of action and other enforcement rights for

(1)      damages,
(2)      injunctive relief, and
(3)      any other remedies of any kind

for past, current, and future infringement; and

(g)      all rights to collect and seek royalties and other payments under or on account of any of the Patents and/or any item in any of the foregoing categories (b) through (f); and

(h)      the right to use any provisional patent applications from which any of the Patents claim or derive priority for the purposes of prosecuting, maintaining and defending the Patents before any public or private agency, office or registrar including by filing reissues, reexaminations, divisionals, continuations, continuations-in-part, substitutes, extensions and all other applications and post issue proceedings included in the Patents and rights to claim priority based on the filing dates of any such provisional.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    EVOLVED-0213197

EW_ITC-0628703

| Group | Application No | Filing Date | Patent Number | Nation | Remarks |
|---|---|---|---|---|---|
| 1 | | | | U.S.A. | Continuation of 14/051074 |
| | 14/051074 | 2013/10/10 | | U.S.A. | |
| | 12/777975 | 2010/05/11 | 8036256 | U.S.A. | |
| | 11/563909 | 2006/11/28 | 7746916 | U.S.A. | Submitted for Evaluation |
| | MX/A/2008/005905 | 2006/11/28 | 279572 | MEXICO | |
| | 2008126206 | 2008/06/27 | 2391789 | RUSSIA | |
| | 1896KOLNP2008 | 2008/05/12 | | INDIA | |
| | 068237684 | 2008/06/03 | | E.P.O | |
| | 200680044410.X | 2006/11/28 | ZL200680044410.X | CHINA | |
| | 2008-542252 | 2006/11/28 | 4819130 | JAPAN | |
| | 95144311 | 2006/11/28 | I378690 | TAIWAN | |
| | PCT/KR06/05060 | 2006/11/28 | | P.C.T | |
| | 10-2005-0114306 | 2005/11/28 | 10-1221890 | KOREA | |
| | 10-2006-0062467 | 2006/07/04 | 10-0930894 | KOREA | |
| | 10-2006-0064091 | 2006/07/07 | 10-1253164 | KOREA | |
| 2 | 12/836391 | 2010/07/14 | 8422427 | U.S.A. | |
| | 07808151 | 2009/03/31 | 2067275 | E.P.O | |
| | 07808151 | 2009/03/31 | 2067275 | GERMANY | |
| | 07808151 | 2009/03/31 | 2067275 | U.K. | |
| | 07808151 | 2009/03/31 | 2067275 | SWEDEN | |
| | 07808151 | 2009/03/31 | 2067275 | SPAIN | |
| | 07808151 | 2009/03/31 | 2067275 | FINLAND | |
| | 07808151 | 2009/03/31 | 2067275 | NETHERLAND | |
| | 07808151 | 2009/03/31 | 2067275 | ITALY | |
| | 07808151 | 2009/03/31 | 2067275 | FRANCE | |
| | 12/440869 | 2009/03/11 | 7768965 | U.S.A. | Submitted for Evaluation |
| | PCT/KR07/04359 | 2007/09/10 | | P.C.T | |
| | 10-2006-0094103 | 2006/09/27 | 10-1328921 | KOREA | |
| | 10-2006-0087290 | 2006/09/11 | 10-0937422 | KOREA | |
| 3 | 13/487081 | 2012/06/01 | 8412201 | U.S.A. | |
| | 12/870747 | 2010/08/27 | 8219097 | U.S.A. | |
| | 1324KOLNP2008 | 2006/09/15 | | INDIA | |
| | 06847353 | 2006/09/15 | | E.P.O | |
| | 200802861 | 2006/09/15 | 200802861 | SOUTH AFRICA | |
| | 2006323560 | 2006/09/15 | 2006323560 | AUSTRALIA | |
| | PI06177832 | 2006/09/15 | | BRAZIL | |
| | MX/A/2008/004924 | 2006/09/15 | 278729 | MEXICO | |

CONFIDENTIAL – ATTORNEYS' EYES ONLY                    EVOLVED-0213198

|   | | | | | |
|---|---|---|---|---|---|
|   | 2008-533234 | 2006/09/15 | 4677490 | JAPAN | |
|   | 200680040518.1 | 2006/09/15 | ZL200680040518.1 | CHINA | |
|   | 2008113180 | 2008/06/02 | 2411660 | RUSSIA | |
|   | 95138124 | 2006/10/16 | I354505 | TAIWAN | |
|   | PCT/KR06/03697 | 2006/09/15 | | P.C.T | |
|   | 11/553939 | 2006/10/27 | 7809373 | U.S.A. | Submitted for Evaluation |
|   | 10-2006-0063135 | 2006/07/05 | 10-0981811 | KOREA | |
|   | 14/020537 | 2013/09/06 | | U.S.A. | |
|   | | | | U.S.A. | Continuation of 14/020537 |
|   | 13/489408 | 2012/06/05 | | U.S.A. | NOA Received (2013/08/14) |
|   | 2009-514211 | 2007/06/08 | 5174015 | JAPAN | |
|   | 2007800214808 | 2008/12/09 | | CHINA | |
| 4 | 077468551 | 2009/01/06 | | E.P.O | NOA Received (2013/12/18) |
|   | 12/303947 | 2010/07/07 | 8218481 | U.S.A. | |
|   | 96120838 | 2007/06/08 | | TAIWAN | |
|   | PCT/KR07/02784 | 2007/06/08 | | P.C.T | |
|   | 10-2006-0052167 | 2006/06/09 | 10-1227505 | KOREA | |
|   | 10-2006-0057488 | 2006/06/26 | 10-1233172 | KOREA | |
|   | 13/801529 | 2013/03/13 | | U.S.A. | |
|   | 12/972366 | 2010/12/17 | 8422410 | U.S.A. | |
|   | 2009-80120004 | 2010/11/30 | | CHINA | |
|   | 2720833 | 2010/10/07 | | CANADA | NOA Received (2013/08/08) |
| 5 | PCT/KR09/04002 | 2009/07/20 | | P.C.T. | |
|   | 12/538514 | 2009/08/10 | 7881236 | U.S.A. | Submitted for evaluation |
|   | 09166620 | 2009/07/28 | | E.P.O. | |
|   | 0912850.5 | 2009/07/23 | 2462517 | U.K. | |
|   | 10-2009-0057128 | 2009/06/25 | 10-0939722 | KOREA | |

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    EVOLVED-0213199

IN WITNESS WHEREOF this Assignment of Patent Rights is executed at _____ on

_____.

ASSIGNOR:

**LG ELECTRONICS INC.**

By: _____

Name: _____Hwi-Jae CHO_____

Title: _____Director_____

CONFIDENTIAL - ATTORNEYS' EYES ONLY

서울 서초구 서초동 1305-2
[별지 제41호서식]

공증
인가 동화법무법인

(전화) 02-3481-0028
(팩스) 02-3474-5920

Registered No.    2014 -   832

# NOTARIAL CERTIFICATE

Dong Hwa Law Corporation

1305-2, Seocho-dong, Seocho-Ku,
Seoul, Korea

210mm X 297mm
보존용지(1종) 70g/㎡

CONFIDENTIAL - ATTORNEYS' EYES ONLY

EVOLVED-0213201

EW_ITC-0628707

| Group | Application No | Filing Date | Patent Number | Nation | Remarks |
|---|---|---|---|---|---|
| 1 | | | | U.S.A. | Continuation of 14/051074 |
| | 14/051074 | 2013/10/10 | | U.S.A. | |
| | 12/777975 | 2010/05/11 | 8036256 | U.S.A. | |
| | 11/563909 | 2006/11/28 | 7746916 | U.S.A. | Submitted for Evaluation |
| | MX/A/2008/005905 | 2006/11/28 | 279572 | MEXICO | |
| | 2008126206 | 2008/06/27 | 2391789 | RUSSIA | |
| | 1896KOLNP2008 | 2008/05/12 | | INDIA | |
| | 068237684 | 2008/06/03 | | E.P.O | |
| | 200680044410.X | 2006/11/28 | ZL200680044410.X | CHINA | |
| | 2008-542252 | 2006/11/28 | 4819130 | JAPAN | |
| | 95144311 | 2006/11/28 | I378690 | TAIWAN | |
| | PCT/KR06/05060 | 2006/11/28 | | P.C.T | |
| | 10-2005-0114306 | 2005/11/28 | 10-I221890 | KOREA | |
| | 10-2006-0062467 | 2006/07/04 | 10-0930894 | KOREA | |
| | 10-2006-0064091 | 2006/07/07 | 10-1253164 | KOREA | |
| 2 | 12/836391 | 2010/07/14 | 8422427 | U.S.A. | |
| | 07808151 | 2009/03/31 | 2067275 | E.P.O | |
| | 07808151 | 2009/03/31 | 2067275 | GERMANY | |
| | 07808151 | 2009/03/31 | 2067275 | U.K. | |
| | 07808151 | 2009/03/31 | 2067275 | SWEDEN | |
| | 07808151 | 2009/03/31 | 2067275 | SPAIN | |
| | 07808151 | 2009/03/31 | 2067275 | FINLAND | |
| | 07808151 | 2009/03/31 | 2067275 | NETHERLAND | |
| | 07808151 | 2009/03/31 | 2067275 | ITALY | |
| | 07808151 | 2009/03/31 | 2067275 | FRANCE | |
| | 12/440869 | 2009/03/11 | 7768965 | U.S.A. | Submitted for Evaluation |
| | PCT/KR07/04359 | 2007/09/10 | | P.C.T | |
| | 10-2006-0094103 | 2006/09/27 | 10-1328921 | KOREA | |
| | 10-2006-0087290 | 2006/09/11 | 10-0937422 | KOREA | |
| 3 | 13/487081 | 2012/06/01 | 8412201 | U.S.A. | |
| | 12/870747 | 2010/08/27 | 8219097 | U.S.A. | |
| | 1324KOLNP2008 | 2006/09/15 | | INDIA | |
| | 06847353 | 2006/09/15 | | E.P.O | |
| | 200802861 | 2006/09/15 | 200802861 | SOUTH AFRICA | |
| | 2006323560 | 2006/09/15 | 2006323560 | AUSTRALIA | |
| | PI06177832 | 2006/09/15 | | BRAZIL | |
| | MX/A/2008/004924 | 2006/09/15 | 278729 | MEXICO | |

CONFIDENTIAL - ATTORNEYS' EYES ONLY          EVOLVED-0213202

IN WITNESS WHEREOF this Assignment of Patent Rights is executed at LG Twin Towers 20, Yoido-dong, Youngdungpo-gu, Seoul, South Korea, 150-721 on February 7, 2014.

ASSIGNOR:

**LG ELECTRONICS INC.**

By: _____

Name: Hwi-Jae Cho _____

Title: Director _____

Very truly yours,
**LG Electronics Inc.**

BON JOON KOO    VICE CHAIRMAN & CEO
CTQ 1

CONFIDENTIAL - ATTORNEYS' EYES ONLY          EVOLVED-0213203

EW_ITC-0628709

**EXHIBIT B - IDENTIFICATION OF ENCUMBRANCES**

| Party | Term |
|---|---|
| Qualcomm Inc. | December 31, 2020 |
| Intel Corporation | Lifetime<br><br>(patents with a first effective filing date on or prior to September 7, 2007) |
| Toshiba Corporation | Lifetime |
| Sony Corporation | Lifetime |
| NEC Corporation | August 15, 2016 |
| Mitsubishi Electric Corporation | March 28, 2028 |
| Vizio Inc. | December 31, 2014 |
| Microsoft Corporation | Lifetime<br><br>(patents with effective filing date on or before December 31, 2006) |

CONFIDENTIAL - ATTORNEYS' EYES ONLY          EVOLVED-0213204

EW_ITC-0628710

**EXHIBIT C – ETSI DECLARATION BY LG ELECTRONICS**

| Publication number | ETSI Declaration references | Declaration dates | Essential to projects | Essential to standards YES to ETSI FRAND license |
|---|---|---|---|---|
| US7809373 | ISLD-200904-002 ISLD-201005-005 ISLD-201209-002 | 12/03/2009 12/04/2010 17/09/2012 | 3GPP-Release-8 (GSM Phase 2+ and UMTS/LTE release 8) LTE (Rel-8 LTE – 3G Long Term Evolution – Evolved Packet System RAN part) | TS 36.300 TS 36.321 TS 36.331 TS 36.423 |
| US7881236 | ISLD-200909-005 | 2009-08-31 | LTE (Rel-8 LTE – 3G Long Term Evolution – Evolved Packet System RAN part) | TS 136.321 TS 36.321 |
| US8218481 | ISLD-201209-002 ISLD-201209-020 | 17/09/2012 23/10/2012 | 3GPP-Release-8 (GSM Phase 2+ and UMTS/LTE release 8) LTE (Rel-8 LTE – 3G Long Term Evolution – Evolved Packet System RAN part) | TS 36.211 TS 36.211 |
| US7746916 | ISLD-200904-002 | 2009-03-12 | LTE (Rel-8 LTE – 3G Long Term Evolution – Evolved Packet System RAN part) | TS 36.211 |
| US7768965 | ISLD-200909-005 | 2009-08-31 | LTE (Rel-8 LTE – 3G Long Term Evolution – Evolved Packet System RAN part) | TS 136.321 TS 36.321 |

CONFIDENTIAL – ATTORNEYS' EYES ONLY                    EVOLVED-0213205

### EXHIBIT D – RELEASE BY ICEBERG CAPITAL PARTNERS

Iceberg Capital Partners ("Iceberg") hereby releases and agrees to hold harmless TQ Lambda, LLC, its officers, directors, employees, representatives, members, shareholders, agents, successors and assignees (collectively "Purchaser"), from and against any and all claims, known or unknown, associated with the Patent Purchase Agreement between Purchaser and LG Electronics Inc. ("Seller") dated January 3, 2014 (the "Agreement") and which may arise between Iceberg and TQ, including without limitation any claim for fees that may be due Iceberg as a result of the sale of any patents.   Iceberg further acknowledges that any obligation for payment for Iceberg's services in connection with the Agreement is owed by Seller and not Purchaser.

Dated: January 27, 2014

By: _____

Name: ZARIF IMAM

Title: HEAD OF CLIENT RELATIONS